# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

| | |
|---|---|
| **UNITED SPECIALTY INSURANCE COMPANY,** | |
| *Plaintiff,* | **CIVIL ACTION NO. 3:23-cv-00049-TES** |
| **v.** | |
| **ALRA LOGISTICS, LLC; XAVIER GERARD DOWNER; and JAMELA SMITH,** | |
| *Defendants.* | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, Plaintiff United Specialty Insurance Company ("United Specialty") filed this declaratory-judgment action regarding a lawsuit that is currently pending in the State Court of Clarke County, Georgia. There, Defendant Jamela Smith filed the underlying lawsuit after she allegedly sustained injuries from a motor vehicle accident. Contrary to what you'd expect, Ms. Smith wasn't in a car or even on the road.

## BACKGROUND

According to her operative pleading from the underlying lawsuit, Ms. Smith alleges that while she was asleep, Defendant Xavier Gerard Downer, who was driving a box truck on behalf of his employer, Defendant Alra Logistics, LLC ("Alra Logistics"),

ran a stop sign and crashed into her bedroom at 4:17 a.m. on July 24, 2021. [Doc. 1-1, ¶¶ 1, 7–8]; [Doc. 28-4, ¶¶ 16–18]; [Doc. 24-1, Kleyman Depo., pp. 9–10, 8:23—9:2]. From May 6, 2021, to May 6, 2022, United Specialty issued a commercial automobile liability insurance policy to Alra Logistics. [Doc. 28-2, pp. 6–8, 14]; [Doc. 28-4, ¶ 1]. Like all such policies, this one has droves of provisions regarding coverage and many that exclude it. Of course, not every single provision is relevant to the underlying lawsuit, but there are several relied upon by United Specialty in its efforts to have this Court declare that it doesn't have a duty to defend or indemnify either Alra Logistics or its driver, Downer. [Doc. 28-1, p. 15]. Here are some of the most important:

"Throughout this policy[,] the words 'you' and 'your' refer to the Named Insured"—Alra Logistics—"shown in the Declarations. The words 'we', 'us' and 'our' refer to the Company providing this insurance." [Doc. 28-2, pp. 9, 14].

As to "**Coverage**":

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto". . . . We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply.

[*Id.* at pp. 15–16]; [Doc. 28-4, ¶ 3]. Next, when it comes to "**Who Is An Insured**," the policy states that

[t]he following are "insureds":

    a.     You for any covered "auto";

    b.     Anyone else whom you have advised the Company and received formal approval in writing from the Company while using with your permission a covered "auto" you own, hire, or borrow **EXCEPT**

. . .

    vii.    "Permissive users" who are users of a covered auto, other than "insureds", who are not approved in writing by the Company.  Coverage for permissive users is subject to reduction to statutory minimums. To the extent permitted under the applicable state law, the limits of coverage shown in the Declarations page are reduced to the state mandatory minimums for bodily injury or death and property damage when there is a permissive user of the covered "auto".

[Doc. 28-2, p. 16]; [Doc. 28-4, ¶ 4]. Then, of course, there are "**Duties in the Event of Accident, Claim, Suit Or Loss**" in which the insured "and other involved 'insured'" must "cooperate with [the insurer] in the investigation or settlement of the claim or defense against the 'suit.'" [Doc. 28-2, p. 22].

Equally important, two relevant endorsements change the policy. First, coverage is excluded pursuant to an "Unlisted Driver Exclusion" stating that United Specialty will not be liable for accidents or losses if a vehicle is being driven by an unlisted driver. [Doc. 28-2, p. 43]; [Doc. 28-4, ¶ 7]. The policy expressly provides that coverage "is limited to those named drivers as scheduled with the Carrier." [Doc. 28-2, p. 12]; [Doc. 28-4, ¶ 8]. When asked to "list all drivers . . . that drive company vehicles[] and employees who drive [their] own vehicles on company business," Alra Logistics named Robert Wharton and Steven Koch, but not Downer or anyone else. [Doc. 28-2, p. 58];

[Doc. 28-4, ¶¶ 9–10].

Just prior to completing the application, Marc Kleyman, Alra Logistics' Chief Executive Officer, signed an underwriting verification form acknowledging and understanding "that an essential factor in obtaining automobile insurance is the list of drivers of vehicles covered by the policy for which the Named Insured is applying." [Doc. 28-2, p. 70]; [Doc. 28-4, ¶ 11]; [Doc. 24-1, Kleyman Depo., p. 11, 10:22–25]. Mr. Kleyman also "declare[d] that [he] . . . disclosed all drivers who will be operating a covered auto on the policy (owned, hired, non-owned) and that [he would] disclose any additional drivers during the policy term prior to their operating any vehicle insured under the policy." [Doc. 28-2, p. 70]; [Doc. 28-4, ¶ 11]. While United Specialty never approved Downer as a driver under the policy, Mr. Kleyman offered unrebutted testimony that he wasn't told he had to list individual drivers. [Doc. 28-4, ¶ 12]; [Doc. 28-2, p. 2, Greenburg Aff., ¶ 7]; [Doc. 24-1, Kleyman Depo., p. 44, 43:21–23].

Second, the policy also excludes coverage under a "Radius Exclusion" for

> any "bodily injury" or "property damage" arising out of any covered "auto" being driven to a point more than 300 miles distance from the place that is reported to us as the primary place where the Named Insured conducts operations while being operated by the named insured and all drivers of the named insured.

[Doc. 28-2, p. 41]; [Doc. 28-4, ¶ 5]. United Specialty contends that when Alra Logistics completed the application, Alra Logistics reported that 100% of its travel takes place "inside" the city limits of Pittston, Pennsylvania. [Doc. 28-2, p. 55]; [Doc. 28-4, ¶ 6].

However, Ms. Smith notes that when she deposed Mr. Kleyman, he testified that the company was an interstate carrier that transported general goods.[1] [Doc. 24-1, Kleyman Depo., pp. 12–13, 11:25—12:6]. In fact, it appears there were four states in play when Alra Logistics obtained its insurance from United Specialty.

As Ms. Smith points out, the application and the policy itself adds a company out of Elkhart, Indiana, "as 'insureds' under the Who Is An Insured provision." [Doc. 24-15, ¶ 6]; [Doc. 28-2, p. 35]. Then, although it's not mentioned in the application, the policy adds another company out of Alpharetta, Georgia, "as 'insureds' under the Who Is An Insured provision." [Doc. 24-15, ¶ 6]; [Doc. 28-2, p. 32]. And lastly, Ms. Smith states that the policy issued to Alra Logistics "describes two International 4300 box trucks" and that both "are noted" in the application "as being garaged in" Hazelwood, Missouri. [Doc. 24-15, ¶ 6]. Well, sort of. While they're not material at all, the vehicle identification numbers spread among the application and policy are a real mess.

As Ms. Smith states, the "Vehicle Schedule" in the policy lists two VINs: 1HTMMAAL2NH331061 and 1HTMMAAL898H075504 with effective dates spanning between May 6, 2021, through May 6, 2022. [Doc. 28-2, p. 13]. Then, effective January 27, 2022, through May 6, 2022, a vehicle with VIN 3HAEUMML6LL844116 was added to the policy. [*Id.* at pp. 44, 52]. However, only one of the box trucks listed in the

---

[1] On the morning of the accident, Mr. Kleyman testified that Downer could have been carrying a piece of old furniture or "an undeliverable item, such as like a no-fit, damaged product, [or] customer refusal." [Doc. 24-1, Kleyman Depo., p. 84, 83:4–12].

application for the vehicles garaged in Hazelwood, Missouri, matches either of these VINs—that matching VIN is 1HTMMAAL89H075504. The other VIN for the Missouri-housed box truck listed in the application is 3ALACWDT2DDFE4602, but it's nowhere to be found in the policy. [*Id.* at p. 60]. Unless it was to show that United Specialty knew that Alra Logistics conducted business well outside the mileage limits of the Radius Exclusion when it issued the policy, the Court is unsure why Ms. Smith even mentioned these additional vehicles because, as you'll soon see, the box truck that Downer drove into her bedroom was a rental. *See* [Doc. 24-25, ¶ 6].

In response to the underlying lawsuit filed by Ms. Smith, United Specialty retained defense counsel for Downer. [Doc. 28-4, ¶ 19]. And, despite United Specialty sending a reservation of rights letter to Downer's last known address, retained counsel hasn't been able to make any contact with him. [*Id.* at ¶¶ 20–21]. Ms. Smith was the only party to file an Answer [Doc. 6] to United Specialty's Complaint [Doc. 1] that initiated this declaratory-judgment action. In time, United Specialty obtained default judgments against Alra Logistics and Downer as to the factual allegations in this action.[2] [Doc. 28-1, p. 4]; [Doc. 16]; [Doc. 21].

Even with default judgments entered against the insured, Alra Logistics, and

---

[2] To be clear, the Court granted default judgment against Alra Logistics and Downer as to the factual allegations contained in United Specialty's Complaint. [Doc. 16, p. 1]; [Doc. 21, p. 1]. As to the legal issues, presented in this declaratory-judgment action, the Court stayed entry of judgment as to Alra Logistics and Downer. [Doc. 16, p. 5]; [Doc. 21, p. 5].

Downer, Ms. Smith may still defend against United Specialty's efforts to obtain a declaratory judgment concerning coverage. "[T]he Supreme Court of the United States has held that a 'case or controversy' exists to support declaratory relief between an injured third party and an insurance company even in the absence of a judgment in favor of the third party against the insured." *Edwards v. Sharkey*, 747 F.2d 684, 686–87 (11th Cir. 1984) (citing *Md. Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273–74 (1940)). Ms. Smith's interest in defining the scope of insurance coverage, as the injured third party, is independent of the interest of the insured. *Penn Am. Ins. v. Valade*, 28 F. App'x 253, 257 (4th Cir. 2002). "When an insurer initiates a declaratory judgment action against both an injured third party and its insured, the injured third party acquires standing—independent of that of the insured—to defend itself in the declaratory judgment proceeding." *Id.* (citing *Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 353 (3rd Cir. 1986) (stating that injured third party "ha[s] standing to defend the declaratory judgment action despite the absence of . . . the actual insured")).

When it comes to the reservation of rights letter United Specialty sent to Downer, the parties don't really rely on it for their summary-judgment arguments, but the Court thinks it's particularly important for understanding how Ms. Smith and United Specialty argue for and against coverage. *See* Fed. R. Civ. P. 56(c)(3). According to the reservation of rights letter, United Specialty understood that the underlying lawsuit arose from an accident on July 24, 2021, in which Ms. Smith was allegedly injured

because Downer "crashed a motor vehicle into [her] residence located in Athens,

Georgia." [Doc. 1-2, p. 2]. In its letter, United Specialty was clear that its understanding

of facts was derived from Ms. Smith's complaint in the underlying lawsuit and that,

consequently, its understanding of what happened "may be untrue, incomplete, or

embellished."[3] [*Id.* at p. 3]. Here's what United Specialty wrote in the reservation of

rights letter to Downer.

> [Ms. Smith] is a resident of Georgia. She allegedly sustained bodily injuries
> because a motor vehicle crashed into her home in Athens, Georgia[,] at 4:17
> a.m. on July 24, 2021. [Ms. Smith] also alleges that the incident caused
> property damage to her residence. The [c]omplaint alleges that you were
> driving a truck rented on behalf of your employer, John Doe Corporation,
> and that you were on company business at the time of the incident. You
> allegedly left the scene of the accident and were later identified as the driver
> of the subject vehicle by John Doe, who came to the scene to retrieve the
> rented truck and the goods contained therein. According to the Motor
> Vehicle Crash Report for the [i]ncident, you had left the scene prior to
> arrival of the police, and there was no alcohol or drug test given.
>
> . . . The [c]omplaint alleges that you negligently had an open container of
> alcohol at the time of the accident. Outside of the [c]omplaint, you
> reportedly claimed (to a private investigator at Lemieux & Associates) that
> you may have been drugged at a party before the accident and that you
> may have blacked out after the accident.
>
> The Motor Vehicle Crash Report for the incident lists the subject vehicle as
> an Enterprise rental truck, with a vehicle identification number of
> 5PVNJ8AV1M5T50113. A rental agreement shows that the subject truck
> was rented by "Alra Logistics LLC, Juan Minero[,]" from an Enterprise
> location in Lawrenceville, Georgia[,] for the period of July 21, 2021[,]

---

[3] The complaint referenced in United Specialty's reservation of rights letter (dated March 1, 2023) had to
be Ms. Smith's original complaint because she didn't file the operative pleading until March 7, 2023. [Doc.
1-1, pp. 2, 8]; [Doc. 1-2, p. 2]; [Doc. 28-3, p. 3].

through July 28, 2021.[4]

[*Id.*]; *see also* [Doc. 1-1, ¶¶ 7–8, 13]; [Doc. 24-11, p. 2]. Based on this letter, various

provisions from within the policy, and other bits and pieces of the record that come into

play throughout the impending discussion, United Specialty contends that it has no

duty to defend or indemnify as a matter of law when it comes to any liability that may

come from Ms. Smith's underlying lawsuit.[5]

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).

## APPLICABLE LAW

Looking to this case's diversity jurisdiction, United Specialty contends that

"Georgia law applies to the instant coverage dispute because the subject accident

occurred in Georgia, . . . both [Ms.] Smith and . . . Downer are residents of Georgia,"

---

[4] The Court is unsure about where United Specialty saw the rental period of July 21, 2021, though July 28, 2021. *See, e.g.*, [Doc. 1-2, p. 3]. As the Court reads the rental agreement, it appears that the "Rental Date" was "06/21/2021" and the "Return Date" was "07/21/2021." [Doc. 24-11, p. 2]. Then, at the bottom of the rental agreement, the "Duration" lists "06/21" through "07/19." [*Id.*].

[5] All throughout its Motion for Summary Judgment [Doc. 22] and its accompanying Statement of Material Facts [Doc. 22-2], United Specialty cited to the 47-page policy and the 19-page application with *horribly* general references to just "[Ex. A at Ex. 1]" and "[Ex. A at Ex. 2]," respectively. *See also* [Doc. 28-1]; [Doc. 28-4]. With such an unpreferred practice used in this case, the Court takes a moment to note that whether it be for this court or any other, parties should never cite to such large documents without specific page citations. The amount of time it took the Court to cull through the policy and application to cross-check United Specialty's arguments and statements with the record evidence because of its lazy citation practices is unacceptable.

and because "[n]o out-of-state statute governs this case." [Doc. 28-1, p. 5]. To be sure, United Specialty is a corporation organized and exists under the laws of the State of Delaware with its principal place of business in Bedford, Texas. [Doc. 1, ¶ 1]; [Doc. 2, ¶ 1]. Alra Logistics is a limited liability company organized under the laws of the State of Pennsylvania, and Ms. Smith and Downer are, of course, Georgia residents.[6] [Doc. 1, ¶¶ 2–3].

Therefore, as an *Erie*-bound federal court, the Court must apply Georgia's choice-of-law rules to determine which state's law will apply. *Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1270 (11th Cir. 2014); *Frank Briscoe Co. v. Ga. Sprinkler Co.*, 713 F.2d 1500, 1503 (11th Cir. 1983) ("A federal court faced with [a] [choice-of-law] issue must look for its resolution [in] the [choice-of-law] rules of the forum state."). On this, the Georgia Supreme Court is quite clear. *See Mt. Hawley Ins. Co. v. East Perimeter Pointe Apartments*, 861 F. App'x 270, 276 (11th Cir. 2021). "If the law to be applied to a contract dispute by a Georgia court or a federal court in Georgia is . . . created [by judges], then 'the common law as expounded by the courts of Georgia' must govern." *Id.* at 276–77 (quoting *Coon v. Med. Ctr., Inc.*, 797 S.E.2d 828, 834 (Ga. 2017)).

Then, with an eye towards the prospect of applying a foreign, out-of-state statue

---

[6] Diversity jurisdiction under 28 U.S.C. § 1332 requires "complete diversity," meaning that no defendant can be a citizen from the same state as a plaintiff. *Boyer v. SCI Shared Servs., Inc.*, No. 5:22-cv-00118-TES, 2022 WL 1521692, at *1 (M.D. Ga. May 13, 2022) (citing *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998)) ("Diversity jurisdiction requires complete diversity; every plaintiff must be diverse from every defendant.").

because the policy was delivered in Pennsylvania, Ms. Smith argues in her Response

[Doc. 24] that Pennsylvania law should apply in the event this insurance dispute hinges

on a Pennsylvania statute or a judicial decision on a statute from Pennsylvania's courts.

[Doc. 24, pp. 5–6]; *see, e.g.*, [Doc. 28-2, pp. 7–9, 11]. However, absent a Pennsylvania

statute "that directly governs the outcome of this insurance-coverage dispute," the

Court, as a federal court in Georgia, is bound to apply Georgia common law. *Mt.*

*Hawley*, 861 F. App'x at 277. As you may have already deduced, there's no allegation

from Ms. Smith's complaint in the underlying lawsuit that anything—when it comes to

Downer driving a box truck into her house—happened in Pennsylvania. So, despite Ms.

Smith's reliance on Pennsylvania's law for insurance requirements for intrastate

common carriers, it doesn't apply. [Doc. 24, pp. 10–11 (quoting Pa. Code § 32.12)]. Only

Georgia law applies in this case.

That said, in its pursuit of summary judgment, United Specialty argues that it

has no duty to defend or indemnify Alra Logistics and Downer based on the Unlisted

Driver Exclusion and the Radius Exclusion. [Doc. 28-1, p. 8]. Further, as to Downer,

specifically, United Specialty contends that it has no duty to defend or indemnify him

because he was not an "Insured" as required by the policy and has failed to cooperate

with United Specialty in accordance with the policy's terms. [*Id.*]. With respect to

construction of insurance policies, its duty to defend, and its duty to indemnify, United

Specialty directs the Court to many of the following sources of Georgia law.

A.    **Construction of Insurance Policies**

Insurance policies are simply contracts, subject to the general rules of contract

construction. *RLI Ins. v. Highlands on Ponce, LLC*, 635 S.E.2d 168, 171 (Ga. Ct. App. 2006).

(quoting *Hunnicutt v. S. Farm Bureau Life Ins. Co.*, 351 S.E.2d 638 (Ga. 1987)). They "must

be construed as a whole, and all of the provisions should be . . . interpreted so as to

harmonize" with one another. *Id.* at 171 (citation omitted). As contracts, the construction

of an insurance policy is a question of law for courts "peculiarly well suited for

disposition by summary judgment" so long as there isn't an ambiguity in terms.

O.C.G.A. § 13-2-1; *Serv. Merch. Co. v. Hunter Fan Co.*, 617 S.E.2d 235, 237 (Ga. Ct. App.

2005). In the absence of an ambiguity—when an insurance policy is clear and capable of

only on reasonable interpretation—"no construction is necessary or even permissible by

the trial court." *Ainsworth v. Perrault*, 563 S.E.2d 135, 140–41 (Ga. 2002); *Nguyen v.

Lumbermans Mut. Cas. Co.*, 583 S.E.2d 220, 223 (Ga. Ct. App. 2003) (citation omitted).

However, if a policy provision is susceptible to more than one meaning, the

provision is ambiguous even if each meaning is logical and reasonable, and pursuant to

O.C.G.A. § 13–2–2(5), the ambiguity will be construed strictly against the insurer and in

favor of the insured. *Ga. Farm Bureau Mut. Ins. Co. v. Smith*, 784 S.E.2d 422, 424–25 (Ga.

2016). Although an ambiguous insurance policy must be liberally construed in favor of

the insured, the insurer's liability cannot be expanded beyond what is fairly within the

policy's plain terms. *Ranger Ins. Co. v. Columbus-Muscogee Aviation, Inc.*, 204 S.E.2d 474,

476 (Ga. Ct. App. 1974). And, when it comes to terms, "unless the policy itself indicates that a term is used in an unusual sense, [courts] attribute to that term its usual and common meaning." *Taylor Morrison Servs., Inc. v. HDI-Gerling Am. Ins. Co.*, 746 S.E.2d 587, 590 (Ga. 2013). Finally, while exclusions from coverage must be construed strictly against the insured, they "must be given effect, even if beneficial to the insurer and detrimental to the insured." *Simpson v. Infinity Select Ins. Co.*, 605 S.E.2d 39, 43 (Ga. Ct. App. 2004); *First Am. Title Ins. Co. v. DJ Mortg., LLC*, 761 S.E.2d 811, 815 (Ga. Ct. App. 2014).

### B.    Duty to Defend

Under Georgia law, an insurance company's duty to defend is determined by comparing the allegations of the complaint with the provisions of the policy. *See Fireman's Fund Ins. Co. v. Univ. of Ga. Ath. Ass'n,* 654 S.E.2d 207, 209 (Ga. Ct. App. 2007). The Georgia Supreme Court has stated:

> The true rule is that the duty to defend is determined by the contract; and since the contract obligates the insurer to defend claims asserting liability under the policy; even if groundless, the allegations of the complaint [against the insured] are looked [at] to determine whether a liability covered by the policy *is asserted*.

*Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 490 S.E.2d 374, 376 (Ga. 1997). To be sure, insurance companies are "obligated to defend where . . . the allegations of the complaint against the insured are ambiguous or incomplete with respect to the issue of insurance coverage." *Id.* In order to shed this obligation, the complaint "must unambiguously

exclude coverage under the policy." *Id.* If there is the potential for a claim to come within the policy, the duty to defend exists, and should there be an issue of potential coverage, doubt as to liability and the insurer's duty to defend should be resolved in favor of the insured. *Id.*

The general rule is that "in making a determination of whether to provide a defense, an insurer is entitled to base its decision on the complaint and the facts presented by its insured." *Colonial Oil Indus. Inc. v. Underwriters Subscribing to Pol'y Nos. TO31504670 & TO31504671*, 491 S.E.2d 337, 338 (Ga. 1997). Thus, insurance companies are "under no obligation to independently investigate the claims against its insured" since the insured is in the optimal position to investigate and develop facts that will bear on the issue of coverage. *Id.*

"A different rule, however, applies when the complaint on its face shows no coverage, but the insured notifies the insurer of factual contentions that would place the claim within the policy coverage." *Id.* In such a situation, Georgia law says that "the insurer has an obligation to give due consideration to its insured's factual contentions and to base its decision on 'true facts.'" *Id.* (citing *Loftin v. U.S. Fire Ins. Co.*, 127 S.E.2d 53, 56 (Ga. Ct. App. 1962)). Requiring insurance companies to base their decision on true facts "will necessitate that the insurer conduct a reasonable investigation into its insured's contentions." *Id.*

To relieve an insurer of any duty to investigate its insured's contentions would allow the allegations of a third-party to determine the insured's

rights under its contract. Placing a duty of investigation on insurers in these limited circumstances is not an unreasonable burden, especially in light of the availability of the "procedurally safe course" of providing a defense under a reservation of rights and filing a declaratory judgment action to determine its obligations. An insurer who fails to investigate its insured's contentions and refuses a defense will be liable for a breach of the duty to defend if a reasonable investigation at the time would have established the potential for coverage.

*Id.*

C.    **Duty to Indemnify**

If there is no duty to defend, there is no duty to indemnify. *Nat'l Cas. Co. v. Pickens*, 582 F. App'x 839, 841 (11th Cir. 2014) (first citing *Shafe v. Am. States Ins. Co.*, 653 S.E.2d 870, 873 (Ga. Ct. App. 2007) ( "[A]n insurer's duty to defend is broader than its duty to indemnify."); and then citing *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 225 (3d Cir. 2005) ("Because the duty to defend is broader than the duty to indemnify, there is no duty to indemnify if there is no duty to defend.")). Thus, in determining whether United Specialty is entitled to the declarations it seeks, the Court would begin its discussion by first looking to see whether United Specialty has a duty to defend Alra Logistics and Downer in the underlying lawsuit. However, because Ms. Smith's underlying lawsuit is still pending and liability for her alleged injuries has yet to be determined, the Court can't reach the issue of United Specialty's duty to indemnify. *Schneider v. United Specialty Ins. Co.*, 603 F. Supp. 1352, 1357 (M.D. Ga. 2022). Again, though, to ascertain United Specialty's duty to defend, the Court must first examine the allegations of Ms. Smith's complaint from the underlying lawsuit in conjunction with

the relevant policy language "to determine whether a liability covered by the policy *is asserted*" or whether "the allegations of [her] complaint against [Alra Logistics and Downer] are ambiguous or incomplete with respect to the issue of insurance coverage." *Shafe*, 653 S.E.2d at 873 (quoting *Penn-Am.*, 490 S.E.2d at 376); *Penn-Am.*, 490 S.E.2d at 376.

## DISCUSSION

Neither United Specialty nor Ms. Smith dispute that Downer drove a box truck into Ms. Smith's residence in Athens, Georgia. [Doc. 1-1, ¶¶ 7–10]; [Doc. 28-4, ¶¶ 17–18]; [Doc. 24-15, ¶¶ 17–18]. With that across-the-board understanding, United Specialty turns to the Unlisted Driver Exclusion and the Radius Exclusion as means to exclude coverage for the claims asserted in the underlying lawsuit against Alra Logistics and Downer. [Doc. 28-1, pp. 8–11]. Then, specifically to Downer, United Specialty contends that it doesn't have a duty to defend him because he's "not an 'insured' as required by the [p]olicy's insuring agreement" and because he hasn't cooperated with United Specialty when it comes to the claims asserted against him and Alra Logistics in the underlying lawsuit. [*Id.* at pp. 8, 11–14]. In responding to each of those arguments, Ms. Smith argues that United Specialty can't avoid its duties based on either the Unlisted Driver Exclusion or the Radius Exclusion and that even if it could, those types of exclusions are void due to public policy considerations. [Doc. 24, p. 10].

A.    **The "Unlisted Driver Exclusion"**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**UNLISTED DRIVER EXCLUSION**

This endorsement modifies insurance provided under the following:

AUTO DEALERS COVERAGE FORM
BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to the coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**WE WILL NOT BE LIABLE FOR ANY 'ACCIDENTS' OR 'LOSSES' WHILE A COVERED 'AUTO' IS DRIVEN BY AN UNLISTED DRIVER.**

---

[Doc. 28-2, p. 43]. Then, earlier in the policy, it states with respect to

---

ITEM FIVE: <u>COVERED DRIVERS</u>

"The coverage afforded hereunder is limited to those named drivers as scheduled with the Carrier."

---

[*Id.* at p. 12]. United Specialty argues that it has no duty to defend either Alra Logistics or Downer because "Georgia courts have interpreted similar provisions as precluding coverage for injuries caused by a driver who is not named on the policy." [Doc. 28-1, p. 8 (citing *Kindley v. First Acceptance Ins. of Ga., Inc.*, 889 S.E.2d 412, 417 (Ga. Ct. App. 2023))]. "Competent parties are free to choose, insert, and agree to whatever provisions they desire in a contract, including insurance contracts, unless prohibited by statute or public policy." *Hix v. Hertz Corp.*, 705 S.E.2d 219, 221 (Ga. Ct. App. 2010).

To support its argument, United Specialty cites to a case in which an insurance company "sought a declaratory judgment that it did not have to cover damages because the at-fault driver was not a listed driver on the policy." *Kindley*, 889 S.E.2d at 413. After a woman and her boyfriend moved into the same residence, she applied for insurance. *Id.* at 413. As part of the insurance application, she was instructed to list all household members aged 15 or older, and the insurance company warned her that it may not provide coverage for unlisted drivers. *Id.* at 113–14. Under her insurance policy:

> Insured does not mean any driver who is not listed on the policy who also resides in the same household as you or who is a regular operator of any vehicle insured under this policy and is involved in an accident which occurs while the auto is being driven, operated, manipulated, maintained, serviced or used in any other manner by that person, regardless of whether or not the named insured is occupying the vehicle at the time the said driver is using it in any manner, whatsoever.

*Id.* at 114. Even though she and her boyfriend lived together, she didn't list him on the policy because that would've resulted in a premium increase of $986. *Id.* Just over a couple of weeks after she obtained her insurance, her boyfriend—while driving her vehicle with her permission—collided with another vehicle. *Id.*

As United Specialty contends, Georgia law permits these types of coverage exclusions in insurance policies unless public policy says otherwise. *Id.* (quoting *Hix*, 705 S.E.2d at 221). Insurance companies may reject coverage for an individual expressly excluded from a policy so long as the exclusion is supported by consideration *Id.* (quoting *Middlebrooks v. Atlanta Cas. Co.*, 476 S.E.2d 82, 82 (Ga. Ct. App. 1996)). In

*Kindley*, that consideration was avoiding an increased premium. *Id.* at 414–15. Like the

motorists in *Kindley*, if United Specialty doesn't have a duty to defend either Alra

Logistics or Downer, Ms. Smith may not have access to other insurance. *See id.* at 416.

Even still, unlisted driver exclusions—like the one in *Kindley*—are not void, regardless

of whether the injured party has access to other insurance. *Id.* However, *Kindley*

involved only an insurance policy for a personal automobile. 889 S.E.2d at 413. Alra

Logistics is an interstate carrier and *that* is a notable distinction that pulls *Kindley* from

any application to this declaratory-judgment action. [Doc. 24-1, Kleyman Depo., pp. 12–

13, 11:25—12:6].

      With respect to violations of public policy, United Specialty turns to *Kovacs v.*

*Cornerstone National Insurance Co.* in which the Georgia Court of Appeals held that

"[p]ublic policy may justify enlarging an insurer's risk where acts of the undisputed

insured driver are concerned, but not necessarily so where an unauthorized driver who

is not an insured under the policy is involved." 736 S.E.2d 105, 109 (Ga. Ct. App. 2012)

(citation omitted). As for the latter, the Georgia Court of Appeals has previously

affirmed a declaratory judgment for an insurer "where such an unauthorized and thus

uncovered use of [a] vehicle occurred" even though an "unprotected innocent victim"

may not have access to other insurance. *Id.* But again, like *Kindley*, *Kovacs* dealt with an

insurance policy for a personal automobile, not one for a limited liability company like

Alra Logistics. *Kovacs*, 736 S.E.2d at 105–06 (injured party suing 17-year-old boy driving

a vehicle owned by his mother at the time of an automobile accident).

And finally, United Specialty relies on *Ison v. State Farm Fire & Casualty Insurance Co.* where the president of a corporation applied for an automobile insurance policy. 496 S.E.2d 478, 479 (Ga. Ct. App. 1998). The insurance company issued the policy specifically excluding a specific employee from coverage, but the corporation's president, aware of that fact, nevertheless allowed the employee to drive a company vehicle. *Id.* While driving the vehicle, the employee struck another man and killed him. *Id.*

Discussing the public policy concerns underlying *Ison*—the availability of other insurance to injured innocent parties—the Georgia Court Appeals mentioned that "Georgia cases specifically construing named driver exclusions . . . have enforced the exclusions without requiring an inquiry into the availability of other insurance to the injured party." *Id.* at 480. So, in affirming the trial court's ruling that "no coverage [was] available under th[e] policy because [the employee] was the subject of a named driver exclusion," the Georgia Court of Appeals noted that "named driver exclusion[s] [are] analogous to there being no policy at all with respect to the named excluded driver[.]" *Id.* Not only does *Ison* pre-date the primary case law relied upon by Ms. Smith by about 13 years, but a distinguishing factor looms over United Specialty's hard reliance on *Ison*. *See Sapp v. Canal Ins. Co.*, 706 S.E.2d 664 (Ga. 2011). The company involved in the accident was a glass company, and there's nothing from *Ison* to indicate that, as a glass

company, it was an interstate carrier that transported general goods like Alra Logistics. *Id.* at 479; [Doc. 24-1, Kleyman Depo., pp. 12–13, 11:25—12:6].

In attempting to apply *Kindley*, *Kovacs*, and *Ison*, United Specialty points out that Alra Logistics only listed Robert Warton and Steven Koch as drivers "that drive company vehicles." [Doc. 28-1, p. 10]; [Doc. 28-2, p. 58]. Nowhere in the Business Auto Section did Alra Logistics list Downer as a driver of a company vehicle. [Doc. 28-2, p. 58]. To be sure, the only two drivers listed in the policy itself are those two men. [Doc. 28-2, p. 45]. Then, turning to the underwriting verification form, United Specialty notes that Mr. Kleyman "represent[ed], certif[ied], and verif[ied]" that he "disclosed all the drivers who will be operating a covered auto on the policy (owned, hired, or non-owned) and that [he would] disclose any additional drivers during the policy term prior to their operating any vehicle insured under the policy." [*Id.* at pp. 69–70]. Further, Mr. Kleyman "represent[ed], certif[ied], and verif[ied]" that he understood that there would be no coverage "for any 'accidents' or 'losses' while a covered [vehicle] is driven by any unlisted driver[.]" [*Id.*].

Based on this, United Specialty contends that "the plain and unambiguous language of the Unlisted Driver Exclusion bars coverage for the subject accident" entitling it to summary judgment so that it has no duty to defend Alra Logistics or Downer in the underlying lawsuit. [Doc. 28-1, p. 10]. Although the Court disagrees that *Kindley*, *Kovacs*, or *Ison* are sufficiently analogous to govern the outcome of the issues

presented here, the nature of Alra Logistics' business spells particular problems for

United Specialty's efforts to avoid its duty to defend. But more on that later.

    **B.**    **The "Radius Exclusion"**

The second provision United Specialty focuses on is the Radius Exclusion. [Doc.

28-1, pp. 10–11].

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EXCLUSION – VEHICLES TRAVELING BEYOND
DESIGNATED RADIUS OF OPERATION**

This endorsement modifies insurance provided under the following:

    BUSINESS AUTO COVERAGE FORM
    MOTOR CARRIER COVERAGE FORM

The coverage territory definition is amended as follows:

This insurance does not apply to any "bodily injury" or "property damage" arising out
of any covered "auto" being driven to a point more than 300 miles distance from the
place that is reported to us as the primary place where the Named Insured conducts
operations while being operated by the named insured and all drivers of the named
insured.

All other terms. Limits, conditions and provisions of the policy remain unchanged.

---

[Doc. 28-2, p. 41].

Relying on *Ainsworth*, United Specialty contends that "[t]he Radius Exclusion's

language is susceptible to only one reasonable interpretation," rendering any need for

the general rules of contract construction unnecessary. [Doc. 28-1, p. 10 (citing 563

S.E.2d at 140–41)]. According to United Specialty, the only interpretation of the Radius

Exclusion can be: "when an insured vehicle is being driven to a location more than 300 miles from the insured's reported place of operations, the [p]olicy's liability coverage does not apply to an accident resulting from that trip." [*Id.*].

For the Premises Information, the insurance application lists "inside" the city limits of Pittston, Pennsylvania, which is, of course, more than 300 miles from where Ms. Smith alleges in her complaint that the accident occurred—in Athens, Georgia. [Doc. 28-2, p. 55]; [Doc. 1-1, ¶¶ 1, 3–5, 7]; *see* Fed. R. Evid. 201. Easily enough, United Specialty and Ms. Smith don't dispute that this accident occurred in Athens, Georgia, "more than 300 miles from" Alra Logistics' "reported principal place of operations." [Doc. 28-1, p. 11]; [Doc. 28-4, ¶ 17]; [Doc. 24-15, ¶ 17]. Rather, the dispute with respect to the Radius Exclusion arises from United Specialty's contention that Alra Logistics "reported that 100% of its travel takes place *in* Pittston, Pennsylvania." [Doc. 28-1, p. 11 (emphasis added)]. While the application lists "inside" the city limits of Pittston, Pennsylvania, for the Premises Information, it does, in fact, include other states. [Doc. 28-2, p. 55].

Again, the application identifies a company out of Elkhart, Indiana, as an "additional insured" (with a subrogation waiver) not once, but twice. [*Id.* at pp. 55, 59]. Then, carried over into the policy itself, that Indiana-based company is included as an "additional insured." [*Id.* at p. 35]. The policy states:

**THIS ENDORSMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY**

**ADDITIONAL INSURED**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM

With respect to coverage provided by this endorsement the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement identifies person(s) or organization(s) who are added as "insureds" under the Who Is An Insured provision of the Coverage Form. This endorsement does not alter coverage provider in the Coverage Form.

Unless otherwise specified below this endorsement is effective from the inception date of the Coverage.

**Endorsement effective:    05/06/2021**

**SCHEDULE**

Name of Person(s) or Organization(s)

RAS Logistics Inc IAAOS/Home Depot UST Inc IAAOS 2113 Aeroplex Dr N Elkhart, IN 46514

Each person or organization indicated above is an "insured" for Liability Coverage on a primary basis, but only in respect to the Named Insured's trucking or courier operations.

The inclusion of any additional person(s) or organization(s) shall not operate to increase the limits of the Company's liability.

[*Id.*].

    Mysteriously, the policy itself mentions a company out of Georgia that, for some reason or another, wasn't listed in the application. With respect to that company, the

"additional insured" language from the policy is the exact same (save for the effective

date and, obviously, the business location) as the "additional insured" language used

for the company located in Indiana. [*Id.* at p. 32]. For example,

---

**THIS ENDORSMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY**

**ADDITIONAL INSURED**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM

With respect to coverage provided by this endorsement the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement identifies person(s) or organization(s) who are added as "insureds" under the Who Is An Insured provision of the Coverage Form. This endorsement does not alter coverage provider in the Coverage Form.

Unless otherwise specified below this endorsement is effective from the inception date of the Coverage.

  **Endorsement effective:**  **01/27/2022**

**SCHEDULE**

 Name of Person(s) or Organization(s)

 Ryder Truck Rental Inc. 6000 Windward Parkway Alpharetta GA 30005

Each person or organization indicated above is an "insured" for Liability Coverage on a primary basis, but only in respect to the Named Insured's trucking or courier operations.

The inclusion of any additional person(s) or organization(s) shall not operate to increase the limits of the Company's liability.

---

[*Id.*].

And lastly, as discussed above, the application makes note of two International 4300 box trucks that are garaged in Hazelwood, Missouri, with VINs 3ALACWDT2DDFE4602 and 1HTMMAAL89H075504. [*Id.* at p. 60]. Not to further complicate matters, but the "Vehicle Schedule" from within the policy only lists VINs: 1HTMMAAL2BH331061 and 1HTMMAAL89H075504. [*Id.* at p. 13]. Then later, tucked behind the page regarding the Unlisted Driver Exclusion in the policy, those same two VINs are listed along with a third one: 3HAEUMML6LL844116. [*Id.* at p 44]. VINs 1HTMMAAL89H075504 and 1HTMMAAL2BH331061 have effective dates spanning between May 6, 2021, and May 6, 2022. [*Id.* at pp. 13, 44]. VIN 3HAEUMML6LL844116 has effective dates spanning between January 27, 2022, and May 6, 2022. [*Id.* at pp. 44, 52]. And then, there's VIN 3ALACWDT2DDFE4602 that's listed in the application, but that VIN is nowhere to be found in the policy itself. [*Id.* at p. 60]. None of these vehicles even matter, though, because none of them landed in Ms. Smith's bedroom on April 21, 2021. That vehicle, remember, was an Enterprise box truck with VIN 5PVNJ8AV1M5T50113. [Doc. 1-2, pp. 3, 5]. So, the only possible thing that any mention of Indiana, Georgia, or Missouri has to do with this insurance dispute is to show that United Specialty knew Alra Logistics needed insurance for additional insureds that were more than 300 miles from Pittston, Pennsylvania.

Just based on the mere inclusion of these three additional states spread among

the application and policy, it's clear that Alra Logistics was doing something not solely "inside" Pittston's city limits and "more than 300 miles" away from there. [*Id.* at pp. 32, 35, 41, 55, 60]; [Doc. 27, pp. 9–10]. Pittston, Pennsylvania, is more than 500 miles from Elkhart, Indiana; more than 800 miles from Alpharetta, Georgia; and more than 850 miles from Hazelwood, Missouri. *See* Fed. R. Evid. 201. Since United Specialty is in the business of offering insurance to motor carriers and because Alra Logistics plainly included states outside of Pennsylvania, that is enough to say that Alra Logistics fulfilled its "responsibility to inform [its] insurer of its need for interstate coverage," and put United Specialty on notice of Alra Logistics' status as a motor carrier. *Waters*, 560 F. Supp. 2d at 1323. That would, of course, invoke protections provided by the Motor Carrier Act of 1980, 49 U.S.C. § 10101, *et seq.*, and Georgia's Motor Carrier Act, O.C.G.A § 46-7-1, *et seq.*

Relying on *Waters v. Miller*, a case from this district, United Specialty disagrees that it knew Alra Logistics operated outside of Pennsylvania since "'[t]he mere possibility' that an insured's operations may exceed the bounds of a policy's radius limitation does not shift the burden of obtaining adequate insurance coverage from the insured to the insurer." [Doc. 27, p. 9 (quoting 560 F. Supp. 2d 1318, 1324 (M.D. Ga. 2008))]. *Waters* doesn't apply to this insurance dispute, though, because it was about a company that "secured a commercial vehicle insurance policy on [a] tractor-trailer" that did not "*physically contain*" a critical endorsement. 560 F. Supp. 2d at 1319, 1321

(emphasis added). "In the absence of evidence showing that the insured informed the insurer of its need for interstate coverage," *Waters* recognized that "courts refuse to engraft" statutorily required endorsements onto insurance policies as a matter of law. *Id.* at 1323 (citation omitted). That's not at all what happened here.

Alra Logistics' application listed states other than Pennsylvania; the policy itself mentioned other states; and more importantly than that, the policy that United Specialty issued *contained* the very endorsement at issue in *Waters. See, e.g.,* [Doc. 28-2, pp. 32, 55, 59—60]. The simple inclusion of that all-important endorsement in Alra Logistics' policy along with Mr. Kleyman's unrebutted testimony that United Specialty "kn[ew] exactly what [he was] do[ing]" when it came to the nature of his business is sufficient to say that United Specialty knew it insured an interstate motor carrier and that the endorsement—if the underlying facts are there—could defeat the purpose of its own Radius Exclusion. *See Aequicap Ins. Co. v. Canal Ins. Co.,* 693 S.E.2d 863, 867—68 (Ga. Ct. App. 2010), *infra*; [Doc. 24-1, Kleyman Depo., pp. 16—17, 15:16—16:23].

C.    <u>**United Specialty's Argument That Downer Is Not an "Insured"**</u>

Before delving into either the Motor Carrier Act of 1980 or Georgia's Motor Carrier Act, however, the Court presses on with United Specialty's next point in its quest to avoid any duty to defend. Since Downer is not an "insured," United Specialty says that it has zero duty to defend him. [Doc. 28-1, pp. 8, 11]. Extracted from the policy, United Specialty emphasizes that it "will pay all sums an '**<u>insured</u>**' legally must pay as

damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'." [*Id.* at p. 11 (quoting [Doc. 28-2, p. 16]) (emphasis added)]. Further, United Specialty argues that its duty to defend "does not apply to any person or entity who is not an 'insured'" and "may only potentially apply" when an "insured" has "to defend . . . against a 'suit.'" [*Id.*]; [Doc. 28-2, p. 16].

The policy states:

> [t]he following are "insureds":
> a. You for any covered "auto";
> b. Anyone else whom you have advised the Company and received formal approval in writing from the Company while using with your permission a covered "auto" you own, hire, or borrow **EXCEPT**
> . . .
> vii. "Permissive users" who are users of a covered auto, other than "insureds", who are not approved in writing by the Company. *Coverage for permissive users is subject to reduction to statutory minimums.* To the extent permitted under the applicable state law, the limits of coverage shown in the Declarations page are reduced to the state mandatory minimums for bodily injury or death and property damage when there is a permissive user of the covered "auto".

[Doc. 28-2, p. 16–17 (emphasis added)].

With that in mind, United Specialty circles back to one of its most pivotal arguments—the fact that Downer's "name is not listed anywhere" in the policy and that Alra Logistics did not name any other individuals despite Mr. Kleyman's agreement to "disclose any additional drivers during the policy term prior to their operating any

29

vehicle under the policy." [Doc. 28-1, p. 12]; [Doc. 28-2, p. 70]. According to the insurance underwriter "responsible for the . . . placement of insurance policies on behalf of United Specialty," United Specialty "did not [formally] approve Xavier Gerard Downer as a driver in relation to the [p]olicy at any time." [Doc. 28-2, p. 2, Greenburg Aff., ¶ 7]; [Doc. 28-2, p. 16]. Okay, maybe not, but how do you square that with Mr. Kleyman's testimony that he wasn't told he had to have individual drivers' names listed and the fact that the policy contemplates the possibility of "'[p]ermissive users' who are users of a covered auto, other than 'insureds', who are not approved in writing by the Company?" [Doc. 24-1, Kleyman Depo., p. 44, 43:21–23]; [Doc. 28-2, p. 17]. Set against this backdrop and the allegation in Ms. Smith's complaint that Downer was driving the box truck at the time of the accident, United Specialty makes the iffy contention that Downer's inability to be classified as an "insured" under the policy provides a swift exit on the duty to defend. [Doc. 28-1, p. 12]; [Doc. 1-1, ¶¶ 3, 5, 8–9].

This argument skirts the fact that United Specialty told Downer in its reservation of rights letter that he was, "at best, a 'permissive user' as opposed to an insured." [Doc. 1-2, p. 4]. Thus, obviously referring to the relevant provision from the policy presented above, United Specialty told Downer that as a "permissive user" "any potential coverage for [him] would be reduced to the statutory minimums." [*Id.*]; *see also* [Doc. 28-2, pp. 16–17]. In order for statutory minimums to be in the mix, however, Downer had to be using a "covered 'auto.'" [Doc. 28-2, pp. 16–17]. He was. The "**Covered Autos**"

section of the policy says that a covered auto is a vehicle that Alra Logistics "lease[s],

hire[s], rent[s] or borrow[s]," and United Specialty knew (from the Motor Vehicle Crash

Report referenced in its reservation of rights letter) that Alra Logistics rented the box

truck Downer was driving from Enterprise in Lawrenceville, Georgia. [Doc. 28-2, pp.

14–15]; [Doc. 1-2, pp. 3–5]; [Doc. 24-11, p. 2]. With United Specialty providing such

detail within its reservation of rights letter to Downer about the "potential" for

coverage given his status as a permissive user, one can only assume that United

Specialty points to his failure to cooperate as an effort to avoid even "the state

mandatory minimums for bodily injury . . . and property damage." [Doc. 28-2, p. 17].

### D. United Specialty's Argument That It Has No Duty to Defend Downer Because of His Failure to Cooperate

Finally, in wrapping its efforts to forego any duty to defend on Downer's behalf,

United Specialty (as further evidenced by the default judgment obtained against him)

says that it has no such duty because he failed to "[c]ooperate with [it] in the

investigation or settlement of the claim or defense against the 'suit'." [Doc. 21]; [Doc. 28-

1, p. 12 (quoting [Doc. 28-2, p. 22])]. To this, United Specialty is of the position that even

if Downer could qualify as an "insured," "the undisputed evidence establishes that he

has failed to cooperate with [them] as required for coverage." [Doc. 28-1, p. 12].

Turning to Georgia law, United Specialty argues that to justifiably deny coverage

for an insured's failure to cooperate an insurance company must show three things. [*Id.*

at p. 13 (quoting *Travelers Home & Marine Ins. Co. v. Castellanos*, 773 S.E.2d 184, 186 (Ga.

2015))]; *see also* O.C.G.A. § 33-7-15. First, the insurance company had to reasonably request the insured's cooperation in connection with an asserted claim. *Castellanos*, 773 S.E.2d at 186. Second, the insured must have willfully and intentionally failed to cooperate. *Id.* And third, the insurance company must demonstrate that "the insured's failure to cooperate prejudiced [its] defense of the claim." *Id.* Although Ms. Smith and United Specialty agree that Downer "failed to comply with the [p]olicy's cooperation condition and appears to be actively concealing himself to avoid service," United Specialty nevertheless attempts to detail how each of the above required showings are met in *this* declaratory-judgment action. [Doc. 28-4, ¶ 22]; [Doc. 24-15, ¶ 22].

To begin, United Specialty mailed Downer the reservation of rights letter at his last known address to notify him that it retained legal representation for him with respect to the underlying lawsuit. [Doc. 28-4, ¶¶ 19–20]; [Doc. 24-15, ¶¶ 19–20]; *see, e.g.*, [Doc. 1-2]. In that letter, the law firm representing United Specialty clearly informed Downer that

> [t]he [p]olicy's Business Auto Conditions provide that "you and [any] other involved 'insured' must . . . [c]ooperate with us in the investigation or settlement of the claim or defense against the 'suit'." United Specialty understands that defense counsel has been unable to contact you and that your whereabouts are unknown.

[Doc. 1-2, p. 7]. More than that, United Specialty retained a private investigator to

attempt to locate or contact Downer, but those efforts proved unsuccessful.[7] [*Id.*]; [Doc. 28-1, p. 13]. However, while Downer hasn't lifted a finger with respect to this action, it seems as though he's appeared in the underlying lawsuit. *See generally* [Doc. 28-3]. While Downer's "appearance" is almost certainly a result of United Specialty's defensive duties for the underlying lawsuit, the efforts that United Specialty has made in trying to reach Downer support a conclusion that it reasonably requested his cooperation. *Castellanos*, 773 S.E.2d at 186; *see also Vaughan v. ACCC Ins. Co.*, 725 S.E.2d 855, 858–59 (Ga. Ct. App. 2012).

As for this action, however, Downer has apparently taken great strains to conceal his whereabouts in order to avoid service of United Specialty's Complaint. Even after attempting service at three different addresses, hiring a private investigator, and performing a skip trace, United Specialty hasn't been able to locate him. [Doc. 10-1, pp. 2–3]; *see generally* [Doc. 10-3, Silver Aff.]. With no other possible solution, United Specialty sought leave to serve Downer via publication pursuant to Federal Rule of Civil Procedure 4(e)(1) and O.C.G.A. § 9-11-4(f)(1). [Doc. 10]; [Doc. 10-1]. After securing leave to serve via publication, United Specialty moved for default judgment against Downer, and when entering default judgment against him, the Court ruled that Downer—by virtue of his failure to respond to the Complaint—admitted that he failed

---

[7] Counsel retained by United Specialty has also been unable to contact Downer with respect to the underlying lawsuit. [Doc. 10-3, Silver Aff., ¶ 7].

to comply with the policy's cooperation condition. [Doc. 11]; [Doc. 21, pp. 1, 5]; *cf. State Farm Fire & Cas. Co. v. King Sports, Inc.*, 489 F. App'x 306, 314 (11th Cir. 2012) (applying Georgia law and holding that where an insured's efforts "to communicate the need to cooperate in the investigation and defense . . . were never met with anything but silence" constitutes an "utter failure to cooperate"). Thus, the second requirement for showing that an insured failed to cooperate is met. *Castellanos*, 773 S.E.2d at 186. Downer has willfully and intentionally failed to cooperate with United Specialty in breach of the policy's conditions. *Id.* Georgia law is quite clear that "[n]oncompliance by the insured with [a cooperation] provision or endorsement shall constitute a breach of the insurance contract which, if prejudicial to the insurer, shall relieve the insurer of its obligation to defend its insureds under the policy and of any liability to pay any judgment or other sum on behalf of its insureds." O.C.G.A. § 33-7-15(b).

The third showing, however, is a little hazy. United Specialty states that it "has no knowledge as to [Downer's] present place of residence or whereabouts," so it turns to *Castellanos* where the Georgia Supreme Court recognized that "[a] number of courts have presumed prejudice to the insurer when the insured is completely absent from trial." 773 S.E.2d at 187 (citing *H.Y. Akers & Sons, Inc.*, 172 S.E.2d 355, 358–60 (Ga. Ct. App. 1969)) (listing authorities presuming that insured's willful failure to attend trial to aid in his defense is prejudicial); *see also* [Doc. 10-3, Silver Aff. ¶ 7]. Downer, however, isn't completely absent in the underlying lawsuit as he's clearly submitting responses to

various filings from both Ms. Smith and Alra Logistics. A quick glance at a docket print-out provided by United Specialty in support of its initial summary-judgment brief shows that Downer has made several filings in the underlying lawsuit. These filings include Downer's answer to Ms. Smith's operative pleading, a jury demand, his responses to both Ms. Smith's and Alra Logistics' requests for admissions, and an objection regarding Ms. Smith's notice of intent to tender a medical narrative at trial. *See generally* [Doc. 28-3].

Now, whether United Specialty somehow locates Downer or whether he appears for trial in the underlying lawsuit is a question for a different day. Depending on how liability in Ms. Smith's lawsuit shakes out, if Downer is a "no show," then, under *Castellanos*, United Specialty's duty to indemnify (should Downer be held liable to any extent) would likely be a "no show" as well. Knowing what Downer admitted in the underlying lawsuit, if anything, sure would've been helpful in this action, but when it comes to prejudice to United Specialty, the Court can't say—at this time—that he's always going to be completely absent in the underlying lawsuit. *Castellanos*, 773 S.E.2d at 186.

United Specialty has done exactly what it's supposed to do in providing a defense for Downer in the underlying lawsuit thus far. As more fully discussed below, the Court cannot declare that United Specialty doesn't have a duty to defend either Alra Logistics or Downer against Ms. Smith's claims. As for Downer, though, it's too early to

tell whether United Specialty will be prejudiced because of his "complete[] absen[ce] from trial." *Castellanos*, 773 S.E.2d at 186–87. Therefore, since a claim could potentially come within the policy and since there is so much uncertainty as to whether Downer was permissive user of the Enterprise box truck, United Specialty's Motion for Summary Judgment [Doc. 22] regarding its duty to defend Downer is **DENIED**. Notwithstanding Downer's lack of appearance *in this action*, the ambiguous nature of the underlying complaint compels United Specialty to press on in providing him a defense. *See Penn-Am. Ins.*, 490 S.E.2d at 376. Whether United Specialty has a duty to indemnify Downer for whatever the outcome may be in the underlying lawsuit may be a different story, but again, that's a question for another day. *Schneider*, 603 F. Supp. at 1357. If Downer is found to be a permissive user and within the scope of his employment with Alra Logistics, then easily enough, United Specialty has to pay up to the state mandatory minimums for Ms. Smith's claims. On the other hand, if the facts demonstrate that Downer was not driving the Enterprise box truck on behalf of Alra Logistics on the morning of April 21, 2021, then he's on his own.

     **E.**    **The MCS-90 Endorsement**

     Now, as to United Specialty's duties to defend and indemnify when it comes to Alra Logistics, Ms. Smith contends that United Specialty can't escape those duties

because the policy includes a special endorsement.[8] [Doc. 28-2, pp. 47–49]. The Motor

Carrier Act of 1980 and its regulations require certain interstate motor carriers to obtain

an insurance policy that contains an MCS-90 endorsement.[9] These endorsements are

required for motor carriers who engage in interstate commerce pursuant to the Motor

Carrier Act of 1980, and they obligate insurance companies to pay any judgment, within

policy limits, recovered against the insured motor carrier for liability because of the

carrier's negligence. *Collins v. GKD Mgmt., LP*, --- F. Supp. 3d ----, 2023 WL 8351543, at

*9 (N.D. Ga. Oct. 3, 2023) (citing *Nat'l Specialty Ins. Co. v. Martin-Vegue*, 644 F. App'x 900,

906 (11th Cir. 2016) (per curiam)); *Waters*, 560 F. Supp. 2d at 1321 (quoting *Ill. Cent. R.R.

Co. v. Dupont*, 326 F.3d 665, 666 (5th Cir. 2003)).

 The primary purpose of MCS-90 endorsements "is to assure that injured

members of the public are able to obtain judgment from negligent authorized interstate

carriers." *Waters*, 560 F. Supp. 2d at 1321 (quoting *John Deere Ins. Co. v. Nueva*, 229 F.3d

853, 857 (9th Cir. 2000)); 49 C.F.R. § 387.1 ("The purpose of these regulations is . . . to

assure that motor carriers maintain an appropriate level of financial responsibility for

motor vehicles operated on public highways."). To accomplish this, MCS-90

---

[8] Whether an MCS-90 endorsement makes an insurance carrier liable is a question of law for courts to determine on summary judgment. *Lincoln Gen. Ins. Co. v. De La Luz Garcia*, 501 F.3d 436, 439 (5th Cir. 2007).

[9] "The MCS-90 endorsement must be attached to any liability policy issued to for-hire motor carriers operating motor vehicles transporting property in interstate commerce." *Canal Ins. Co. v. Coleman*, 625 F.3d 244, 247 (5th Cir. 2010) (citing 49 C.F.R. §§ 387.3, 387.7).

endorsements "make[] the insurer liable to third parties for any liability resulting from the negligent use of any motor vehicle by the insured, even if the vehicle is not covered under the insurance policy." *Waters*, 560 F. Supp. 2d at 1321 (quoting *T.H.E. Ins. Co. v. Larsen Intermodal Servs., Inc.*, 242 F.3d 667, 671 (5th Cir. 2001)). MCS-90 endorsements apply "regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." *Id.* (citation omitted). Further, MCS-90 endorsements require indemnification where an underlying insurance policy to which the endorsement is attached does not provide coverage for the motor carrier's accident and where the motor carrier's insurance coverage is either insufficient to satisfy the federally prescribed minimum levels of financial responsibility or is non-existent. *Collins*, 2023 WL 8351543, at *9 (quoting *Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868, 871 (10th Cir. 2009)). In their most general sense, MCS-90 endorsements are essentially suretyships—safety nets by insurance carriers to cover and protect the public when other coverage is lacking. *Waters*, 560 F. Supp. 2d at 1321 (quoting *T.H.E. Ins. Co.*, 242 F.3d at 672); *Coleman*, 625 F.3d at 247 (citing *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 470 (5th Cir. 2005)).

The MCS-90 Form included in the policy United Specialty issued to Alra Logistics defines "public liability" as "liability for bodily injury, property damage, and environmental restoration" and states:

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits states herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

In consideration of the premium states in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits on liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

The limits of the company's liability for the amounts prescribed in this endorsement apply separately to each accident and any payment under the policy because if any one accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

[Doc. 28-2, p. 48]. As for a delineated limit, the Form MCS-90 states that

> *This insurance is primary and the company shall not be liable for amounts in excess of $ 750,000 for each accident.*

[*Id.* at p. 47].

Relying on the MCS-90 endorsement, Ms. Smith says that United Specialty "cannot rely on conditions, exclusions, or violations of the [p]olicy to avoid paying a judgment entered in the [u]nderlying lawsuit." [Doc. 24, p. 5]. To support this argument, Ms. Smith directs the Court to *Aequicap*. There, despite an insurance company's efforts to disclaim coverage because an insured violated several conditions from an insurance policy, the Georgia Court of Appeals affirmed the trial court's decision that an MCS-90 endorsement provided coverage for a personal injury claim brought against that insured. *Aequicap*, 693 S.E.2d at 864–65, 868. In doing so, the *Aequicap* court held that the MCS-90 endorsement attached to the insurance policy applied to cover "a member of the public who was allegedly injured in an automobile accident caused by [a man's] negligent operation of [a] truck in the course of [a] motor carrier business." *Id.* at 864, 867. Looking to what it described as "unambiguous terms" for the MCS-90 endorsement in *Aequicap* (which mirrors, in every important way, the MCS-90 endorsement included in the policy United Specialty issued to Alra Logistics), the Georgia Court of Appeals ruled that the endorsement controlled the resolution of the coverage issue before it—that it's "clear that . . . member[s] of the public [are] whom

40

. . . MCS-90 endorsements [are] intended to protect." *Id.* at 865, 867–68. After all, "it is

critical that [MCS-90 endorsements] have supreme controlling significance" given that

their purpose can only be "accomplished by 'reading out' those provisions or clauses

that conflict with or limit the ability of a third[-]party member of the public to recover

for his loss." *Id.* at 867–68 (first quoting *Price v. Westmoreland*, 727 F.2d 494, 496 (5th Cir.

1984), and then quoting *T.H.E. Ins. Co.*, 242 F.3d at 673).

That's exactly what we have in this case. We have Ms. Smith, someone "whom

the MCS-90 endorsement was intended to protect," and we have Downer, someone

who injured a member of the public through the allegedly negligent operation of a box

truck while allegedly conducting business for Alra Logistics, a motor carrier. *Id.* at 867;

*see also* [Doc. 24, p. 7]. Based on the parallels between this case and *Aequicap*, Ms. Smith

contends that the Unlisted Driver Exclusion and the Radius Exclusion "must be 'read

out'" because they "conflict with or limit [her] ability . . . to recover for [her] loss." [Doc.

24, p. 7]; 693 S.E.2d at 867–68.

United Specialty, though, says that the MCS-90 endorsement included in the

policy it issued to Alra Logistics doesn't even apply to the accident from the underlying

lawsuit. [Doc. 27, p. 3]. To counter Ms. Smith's position about the MCS-90 endorsement,

United Specialty starts with the all-important first step in determining whether they

have to provide a defense—they look to the complaint from the underlying lawsuit.

*Colonial Oil Indus.*, 491 S.E.2d at 338, *supra*. In that complaint, Ms. Smith alleges that

Downer resides in the same state as where the accident took place, in Georgia. [Doc. 1-1, ¶¶ 1–2, 7–8].

In *Grange Indemnity Insurance Co. v. Burns*, the Georgia Court of Appeals noted that "there is a split of authority in the federal courts regarding whether a[n] MCS–90 endorsement applies to an accident caused by an interstate carrier during an intrastate trip carrying nonhazardous materials." 788 S.E.2d 138, 143 (Ga. Ct. App. 2016). In that case, "[t]he trial court ruled that, although it was undisputed that [the motor carrier company] was engaged in intrastate commerce involving nonhazardous commodities at the time of the accident, the MCS-90 applied because [the motor carrier company] was registered as an interstate carrier." *Id.* at 141. The ruling on appeal reversed the trial court. *Id.* at 145. By doing so, the Georgia Court of Appeals followed the "trip specific" approach—the majority approach to the split of authority—"which holds that the MCS-90 endorsement is not applicable when an interstate carrier is engaged solely in intrastate commerce of nonhazardous materials during the specific trip it was engaged in at the time of the accident." *Id.* at 143 (first citing *Coleman*, 625 F.3d at 251 (identifying the "trip specific" approach as the majority approach and providing a comprehensive list of cases using that approach), and then citing *Progressive Gulf Ins. Co. v. Jones*, 958 F. Supp. 2d 706, 714 (S.D. Miss. 2013) (concluding that the "trip specific" approach appears to be the majority approach)); *see also Kolencik v. Progressive Preferred Ins. Co.*, 1:04-CV-3507-JOF, 2006 WL 738715, at *7 (N.D. Ga. Mar. 17, 2006) ("Based on the foregoing, the

court concludes that endorsement MCS-90 plays no role in the instant accident because it involved only intrastate commerce from Cartersville, Georgia to Acworth, Georgia with no intention of the dirt ever going beyond Acworth."). Thus, "[t]he issue is not whether a truck might be used for an interstate shipment in the future. That much could be said of nearly any tractor-trailer rig. Rather, the issue is whether the injury in question occurred while the truck was operating in interstate commerce." *Coleman*, 625 F.3d at 251 (citing *Gen. Sec. Ins. Co. v. Barrentine*, 829 So.2d 980, 984 (Fl. Dist. Ct. App. 2002)) (emphasis omitted).

With that, the issue before the Court is simple. If Downer was not "presently engaged in the transportation of property in interstate commerce," then the MCS-90 endorsement will not apply to provide coverage. *Progressive Mountain Ins. Co. v. O'Dwyer*, No. 4:13-cv-252, 2014 WL 12658951, at *2 (S.D. Ga. Sept. 24, 2014) (quoting *Coleman*, 625 F.3d at 249). First, there is the question of whether Downer was even engaged in commerce. *See* [Doc. 27, p. 3 n.1]. United Specialty points out that when Alra Logistics filed its answer to Ms. Smith's operative pleading in the underlying lawsuit, it asserted that Downer "was not in the scope and course of his employment at the time of the collision such that Alar [*sic*] Logistics, LLC is not liable for his actions." [*Id.*]; [Doc. 27-1, p. 3]; *see also* Fed. R. Evid. 201. Further, in its response to Ms. Smith's requests for admissions, Alra Logistics denied that it provided the truck that crashed into Ms. Smith's bedroom, and it stated that Downer was operating the truck without its

permission. [Doc. 27-2, p. 4 ¶ 4]; *see also* Fed. R. Evid. 201. To the extent that creates a genuine dispute of a material fact when weighed against Ms. Smith's allegations in her complaint, that dispute can be resolved as the underlying lawsuit progresses. On this record, however, there is no evidence to definitively tell the Court *exactly* where Downer was ultimately going or what Downer was doing behind the wheel of the Enterprise box truck at 4:17 a.m. on July 24, 2021.

When Ms. Smith deposed Mr. Kleyman and finally began questioning him about the morning of the accident, he only loosely discusses how Downer would have got behind the wheel of the Enterprise box truck that was left at the scene. [Doc. 24-1, Kleyman Depo., pp. 23, 22:2–7; 59–61, 58:22—60:9]. Mr. Kleyman testified that Downer picked up the box truck from a warehouse dock sometime between 5:00 and 6:00 a.m. on July 23, 2021, to go on a delivery route. [Doc. 24-1, Kleyman Depo., pp. 81–83, 80:15—82:25]. But, when asked whether Downer completed his delivery route for July 23, Mr. Kleyman testified that he didn't know. [*Id.* at p. 84, 83:1–3]. Even though Ms. Smith's complaint and United Specialty's reservation of rights letter suggest that there *were* items in the back of the box truck, Mr. Kleyman couldn't confirm that one way or the other. [*Id.* at p. 84, 83:4–12]. For some reason, although it's against Alra Logistics' operating procedures to "take [a] truck home," it appears that the Enterprise box truck didn't make its way back to originating warehouse dock on the evening of July 23. [*Id.* at pp. 62, 61:12–14; 85, 84:14–15; 97:16–25]. Factually speaking, however, none of this

44

necessarily pulls Downer from driving the Enterprise rental truck *for* Alra Logistics early in the morning on July 24, from the realm of possibilities. More than that, there's nothing in the record to concretely demonstrate that Downer wasn't re-starting an unfinished delivery route very early that morning or that all of those undelivered items that remained in the box truck required him to stay within Georgia. Neither United Specialty nor Ms. Smith provided evidence that would fill these large, factual gaps.

So, United Specialty's contention that "it cannot be disputed that the trip during which the subject accident occurred was a wholly intrastate trip" doesn't carry the day for the intrastate exception to MCS-90 endorsements. [Doc. 27, p. 4]. Since Downer lives in the same state as the rental location for the Enterprise box truck and where the crash occurred, United Specialty locks Downer's travel within Georgia, but we really don't know where he was headed or what he was hauling. *See* [*id.*]. If an item in the box truck was supposed to go to South Carolina, for example, then that specific trip would be interstate. United Specialty assumes that because the crashed occurred in Athens, Georgia, that Athens was the end of the trip. The Enterprise box truck certainly wasn't rented just so it could be crashed into Ms. Smith's bedroom, and there's nothing on the record to tell the Court where Downer was headed or for what purpose he was driving that morning despite the specious implication of his alleged proclivity for stealing automobiles. *See* [Doc. 24-1, Kleyman Depo., pp. 96–97, 95:1—96:6]; *see also* n.10, *infra*. In this case, the box truck stopped in Athens because that's where Downer wrecked it into

Ms. Smith's bedroom. That's simply not enough to show that Downer's trip was purely intrastate. So, what remains very much in dispute in the underlying lawsuit is whether "Downer was driving [the] truck on behalf of" Alra Logistics and in "within the scope of his employment." [Doc. 1-1, ¶¶ 8, 14]. The underlying facts could show that Downer did nothing more than start his delivery route that morning earlier than other drivers. Just as easily, Downer could've been driving the Enterprise box truck outside the scope of his employment with Alra Logistics. Not only does the underlying complaint not "unambiguously exclude coverage under the policy," but the inferences that can be drawn from the facts and evidence on this record mean that there is a potential for a claim to come within the policy. *Penn-Am. Ins.*, 490 S.E.2d at 376. Thus, declaring that United Specialty has no duty to defend Alra Logistics isn't warranted. As of now, the protections afforded by the MCS-90 endorsement included in the policy aren't off the table for Ms. Smith.

### F.    The Georgia Motor Carrier Act

Now, remember when the Court ever so briefly mentioned Georgia's Motor Carrier Act pages ago? Let's get back to that. Ms. Smith's overarching argument in opposing United Specialty's summary-judgment efforts is her contention that the Unlisted Driver Exclusion and the Radius Exclusion must yield to public policy considerations. To support her position that there is definitely a public policy concern at issue in this case, Ms. Smith directs the Court to *Sapp v. Canal Insurance Co.*, where "facts

giving rise to a [trucking company's] status as a motor carrier were clearly known to [an insurance company]" and put the insurance company on notice of the trucking company's "need for insurance complying with [Georgia's] Motor Carrier Act."[10] 706 S.E.2d at 645, 648. Therein lies the obvious reason for Ms. Smith's ardent discussions about box trucks located in Indiana, Georgia, and Missouri for a company that's based out of Pennsylvania and her pointing out Mr. Kleyman's testimony where he testified that United Specialty "kn[ew] exactly what [he was] do[ing]" when it came to the nature of his business. [Doc. 24, p. 3]; [Doc. 24-1, Kleyman Depo., pp. 16–17, 15:16—16:23].

Notwithstanding technical and substantive revisions on several occasions, the Georgia Supreme Court still recognized that "[t]he state motor carrier [laws] were enacted to protect members of the general public against injuries caused by the negligence of a Georgia motor carrier." *Id.* at 644, 646, 646 n.1 (citation omitted). That said, Georgia law defines a "motor carrier" as

> Every person owning, controlling, operating, or managing any motor vehicle, including the lessees, receivers, or trustees of such persons or receivers appointed by any court, used in the business of transporting for hire persons, household goods, or property or engaged in the activity of nonconsensual towing pursuant to [O.C.G.A. §] 44-1-13 for hire over any public highway in this state.

---

[10] United Specialty says *Sapp* has no applicability to this insurance dispute, pointing to a case in which "the Middle District of Georgia . . . previously explained that *Sapp* applies only to carriers engaged in *intrastate* commerce." [Doc. 27, p. 5 (citing *Clark v. Irvin*, No. 1:09-CV-101 (WLS), 2011 WL 13152866 (M.D. Ga. Apr. 6, 2011))]. But, as discussed in some detail above, nobody knows the purpose of Downer's trip that morning or whether it was intrastate or interstate.

O.C.G.A. § 40-1-100(12)(A). Further, Georgia law defines "for hire" to mean "an activity relating to a person engaged in the transportation of goods or passengers for compensation." *Id.* at § 40-1-100(8). And finally, "carrier" is "a person who undertakes the transporting of goods or passengers for compensation." *Id.* at § 40-1-100(1). "Taken together," the Georgia Court of Appeals has stated that "it is clear from the plain language of the statute that the term 'motor carrier' depends in turn on the definition of 'for hire[.]'" *Hughes v. Ace Am. Ins. Co.*, 888 S.E.2d 341, 343 (Ga. Ct. App. 2023). Therefore, not unlike the approach for determining whether the MCS-90 endorsement applied, United Specialty argues that the answer to whether Alra Logistics and Downer "were operating as a 'motor carrier' in regard to the subject accident," lies in focusing on the purpose of Downer's "specific trip leading to the subject accident." [Doc. 27, pp. 6–7].

Over and over, United Specialty has told this Court that the determination as to whether they have a duty to defend is constrained to considering only the underlying complaint "and the facts presented by [the] insured." *See, e.g.* [Doc. 28-1, p. 7 (first citing *Fireman's Fund,* 654 S.E.2d at 209; and then citing *Colonial Oil Indus.*, 491 S.E.2d at 338)]; [Doc. 27, p. 1 (citing *Colonial Oil Indus.*, 491 S.E.2d at 338)]. To try and get this insurance dispute from underneath *Sapp*, United Specialty says that there hasn't been any allegation with respect to whether "the subject vehicle was being used to transport goods, persons, or property for hire at the time of the subject accident." [Doc. 27, p. 7].

Yes, and no.

Ms. Smith's complaint from the underlying lawsuit alleges:

At the same time and place, . . . Downer was driving a truck **on behalf of his employer**, Defendant Alra Logistics, LLC, Defendant John Doe Corporation, and Defendant John Doe on Luther Lane when he failed to stop at the stop sign at the intersection of Luther Lane and Martin Circle, crossed over Martin Circle, and violently crashed directly into [Ms. Smith's] bedroom in her residence, causing extensive damage to the residence and physical injuries to [Ms. Smith]. . . . Downer then left the scene of the crash. . . . Downer was identified as the driver of the subject vehicle **which was provided to . . . Downer by Defendant Alra Logistics, LLC**, Defendant John Doe, and Defendant John Doe Corporation. A person on behalf of the defendants thereafter came to the scene **to retrieve** the rented truck and **the goods contained therein belonging to Defendant Alra Logistics, LLC**, Defendant John Doe, and Defendant John Doe Corporation.

[Doc. 1-1, ¶ 8 (emphasis added)]; *see also* [Doc. 24-10 ¶ 8 (emphasis added)]. First, there's the allegation that Downer "was driving a truck on behalf of his employer," which, as we know, was Alra Logistics, "an interstate carrier that transported [general] goods." [Doc. 1-1, ¶ 8]; [Doc. 24-10 ¶ 8]; [Doc. 24-1, Kleyman Depo., pp. 12–13, 11:25—12:6]. But then, there's the allegation that "[a] person on behalf of the defendants . . . came to the scene to retrieve the rented truck and the goods contained therein *belonging to Defendant Alra Logistics, LLC*, Defendant John Doe, and Defendant John Doe Corporation." [Doc. 1-1, ¶ 8 (emphasis added)]; *see also* [Doc. 24-10 ¶ 8 (emphasis added)]; *but see* [Doc. 24-1, Kleyman Depo., p. 84, 83:1–12]. Based on that, it very well might be that Alra Logistics can't meet the statutory definition of "for hire" if it was carrying its own goods. *See* O.C.G.A. § 40-1-100(8). At any rate, whether Alra Logistics

and Downer were "engaged in the transportation of goods . . . for compensation," is—based on the underlying complaint—ambiguous at best. And, aren't insurance companies "obligated to defend where . . . the allegations of the complaint against the insured are ambiguous or incomplete with respect to the issue of insurance coverage[?]" *Penn-Am. Ins.*, 490 S.E.2d at 376. They are.

As United Specialty mentioned in its initial summary-judgment brief and as the Court discussed above, [i]n order to shed this obligation, the complaint "must unambiguously exclude coverage under the policy." *Id.*; [Doc. 28-1, p. 7]. If there is the potential for a claim to come within the policy, the duty to defend exists, and should there be an issue of potential coverage, doubt as to liability and the insurer's duty to defend should be resolved in favor of the insured. *Penn-Am. Ins.*, 490 S.E.2d at 376; [Doc. 28-1, p. 7]. When Georgia's Motor Carrier Act applies, as it very well could in this case, the important takeaway from *Sapp* is a simple one: "*any* provisions in [an] insurance policy . . . that would serve to reduce or negate [an insurance company's] obligations to the motoring public . . . are void and of no effect." 706 S.E.2d at 649 (citing *Great Am. Indem. Co. v. Vickers*, 188 S.E. 24, 26 (Ga. 1936) ("any provision in the policy of insurance, in so far as it may conflict with the plain provisions of the [motor carrier] statute, must give way, and is superseded by the statutory provisions")). The Georgia Supreme Court invalidated a radius-of-use limitation in *Sapp* and held that it must give way to Georgia's Motor Carrier Act and its purpose of protecting the motoring public. *Id.* at

648–49. Consequently, the extremely similar provisions from the policy United Specialty issued to Alra Logistics—the Unlisted Driver Exclusion and the Radius Exclusion—are unenforceable, and because there is an ambiguity presented by allegations from the underlying complaint, the required resolution, or end result, is to find in favor of a duty to defend. *Id.* Therefore, the Court cannot declare that United Specialty does not have a duty to defend Alra Logistics, and it **DENIES** its Motion for Summary Judgment [Doc. 22].

Two global issues have been put to this Court by United Specialty: Does United Specialty have a duty to defend and indemnify Alra Logistics and Downer in the underlying lawsuit? As to the duty to defend, the Court answers that question in the affirmative. However, because there has been no determination as to *who* is going to be the liable party in the underlying lawsuit, United Specialty's request for a declaration that it does not have a duty to indemnify is not yet ripe, and its Motion for Summary Judgment [Doc. 22] on that front is **DENIED without prejudice**. *Schneider*, 603 F. Supp. at 1357.

Based on these rulings and the fact that Ms. Smith did not cross-move for summary judgment, the parties are **ORDERED** to **SHOW CAUSE** by June 11, 2024, why the Court should not enter judgment in favor of Defendants as to the legal issues discussed above pursuant to Federal Rule of Civil Procedure 56(f). *See* [Doc. 16]; [Doc. 21]; *see also* n.2, *supra*.

**SO ORDERED**, this 28th day of May, 2024.

S/ Tilman E. Self, III
_____

**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**